Our second case for this morning is Michaels Corporation and the Pipeline Contractors Association v. Central States, Southeast and Southwest Areas Pension Fund. Ms. Hoffman. Thank you. The participation agreement that Michaels and all the other employers in this case signed, and that was a pen to the collective bargaining agreement accepted by the fund that was signed at the request of the fund, that agreement prohibits the fund from interpreting its trust agreement to impose a financial obligation beyond that set forth in the National Pipeline Agreement. So isn't the whole question here whether these various extensions, I don't see what's the difference actually between the November 15 extension and the earlier ones, had the effect of simply continuing this underlying agreement, the 2006 agreement, until it was really done, or if there's some other either special status for the November 15, 2011 extension, or what? Because if the fund's position of course is that the agreement was extended and you couldn't just carve out this one part of it, and that doesn't happen until 2012, and obviously your position is you can carve out part of it even if you're extending the rest of the agreement. Well, let's go back to the participation agreement that says the National Pipeline Agreement governs the conditions under which the employers will make contributions to any of the funds that they make contributions to. There are a lot of funds addressed by that participation agreement. And that National Pipeline Agreement in effect through November 15, 2011 called for contributions to central states. The agreement in effect from November 15, 2011 to December 31 was the National Pipeline Agreement, and it said contributions to central states will cease at midnight on November 15. But it wasn't a stand-alone agreement. It was related to the collective bargaining agreement. It was as much a stand-alone agreement as any other agreement that parties enter into when they say we're adopting everything we had in our last agreement with the following changes. So let me ask you this question. Do you see this case yourself as a case about terminating a contractual relationship between the pipeline contractors and the fund, or do you see this as essentially a withdrawal case? Because obviously when there's withdrawal, there's a computation of withdrawal liability that needs to be made. There are a lot of things happening that aren't happening here. Yes. It is both. This particular case is about the obligation to contribute because obviously the withdrawal liability that's been assessed has to work its way through the administrative process and arbitral process for withdrawal liability. You're answering my question. We aren't yet at the withdrawal liability case here. No, but the withdrawal occurs when there is a cessation of the obligation to contribute. Right. And so this case is about when does the obligation to contribute cease. Was it And it's also important to remember that the various extensions were not continuous. When the December 31, 2011 expiration date occurred, as is clear from the trustees' minutes that are in the record, there was a 12-day gap. I believe there was a strike. But it gets fixed retroactively though. I mean there are a lot of other things in these agreements other than just participating in the fund. That's right. There are new job classifications. There are other things in that November 15th agreement that change the terms of the National Pipeline Agreement. And I think it's telling that the fund in their briefs But why is it called an extension? Why didn't you just call it a new agreement? I wasn't handling the negotiations. I don't know. It doesn't matter whether it was you or anybody else. Yeah. I'll use the passive voice if you prefer. If they had said the National Pipeline Agreement is adopted with the same terms as the prior one with the following changes, it would have had exactly the same legal impact. But maybe not. You're assuming the answer to the question before us. If there had been a new agreement on the 15th of November saying here are going to be the terms of our new agreement. Some of them are going to look like the old agreement. Some of them are going to be brand new. We're changing funds. Whatever. New agreements are executed November 15th. That's correct. It was called an extension. Yes. But it is still the National Pipeline Agreement. So in order to get to all of the fund's arguments about deferential review and what the trust agreement says, they have to get beyond the participation agreement's limitation that says they can't use their trust agreement to impose any financial obligation beyond the National Pipeline Agreement. And they say that they haven't since the National Pipeline Agreement's CBA. So nothing new happens until 2012. Right. And they try to make that argument by taking the words National Pipeline Agreement and deleting them and putting in brackets 2006 CBA. The problem they have is that the participation agreement says that the employer will make contributions at a stipulated rate and under certain conditions. That's the introductory section to that participation agreement. And those stipulated rates in certain conditions ended under the National Pipeline Agreement on November 15th, 2011. So they can say, yes, it was an extension. And we agree, okay, it was an extension. But that extension never called for contributions past November 15th, 2011. And that's the financial obligation that exceeds what's in the National Pipeline Agreement. So that makes meaningless, doesn't it? The language that you can't change things during the term of the agreement. That's just so much fluff. That's not the case before this court because the term of the agreement, each extension had its own term and each of those terms ended. Well, you're saying those are all new agreements then. They are all new agreements under labor law. They are new agreements and the fund trustees don't have authority to interpret labor law. Labor law is labor law. No, I don't think they say they are, in fact, interpreting labor law. We know that's not fair. If you look, even if you were to somehow ignore the terms of the participation agreement and say this isn't, you know, that somehow an extra million dollars from Michael's was not an extra financial obligation, if you parse through Article 3, Section 1 of the Funds Trust Agreement, it lays out step by step what has to be done and the employers here did that. And in shame, this court gave multi-employer plan trustees, in effect, a grammar lesson and said maybe you didn't intend to use the term or in a conjunctive sense, but you did. And having written it that way, you're bound by it. And having written Article 3 the way they wrote it, the fund needs to be bound by the plain reading of that section, which is that the employer must, upon execution of each new or successive collective bargaining agreement, including but not limited to interim agreements and memoranda of understandings, which this extension was, each employer shall promptly submit such contract to the Contracts Department. They did that. Then it says it shall be submitted promptly to the fund that in any way alters or affects the contribution obligation. Then it says accept as provided in this section until, you know, the obligation continues after the agreement ends, until the date the fund receives a signed contract, not a signed CBA, again misquoted by the fund in their brief, that eliminates or reduces the duty to contribute to the fund. Or written notification that the employer has lawfully implemented a proposal to withdraw. Every letter that the employer submitted on November 16th to the fund said we have implemented a proposal to withdraw from the fund. Then it says at the end that contributions continue when the collective bargaining agreement... But let me ask you, do you think they could have done that before the 2006 CBA expired? If they were bound by the trust agreement, they could not. But there's an open question in my mind as to whether the participation agreement overrode that provision of the trust agreement. That's the waste management case. And I'm into my rebuttal time. All right, fine. Thank you very much. Mr. Field? Good morning, Your Honors. Eric Field on behalf of the POCA. This is ultimately an ERISA case. And under ERISA, an employer's obligation to contribute to a multi-employer pension plan ends either when there's a collective bargaining agreement that doesn't have an obligation to contribute, a related agreement to a collective bargaining agreement, or in labor law. Whether the November 15th agreement is a new CBA or just a new agreement extending a CBA, it's still an agreement relating to a CBA. As of that date, there was no obligation to contribute to central states. The bargaining parties agreed. This isn't the waste management situation where the bargaining parties tried to end the contribution obligation early. There was no expectation by central states... So you would agree that if they had kind of partway through the 2006 agreement before notice is given that there's going to be renegotiation, et cetera, that there would have been a problem trying to just say, we're tired of contributing to the fund. We're not going to do it anymore. Even though it could be done by agreement, you know, it could be done... Well, Your Honors, under ERISA, there is no prohibition against bargaining parties agreeing to end the obligation. ERISA lets it... So then you just go through the withdrawal obligation. You've got to pay the amount that the fund computes, and you arbitrate if you want to arbitrate, and you do all those things. And ultimately, this case isn't about withdrawal today, but eventually, whether you agree with us or central states, the obligation did end. So there is a withdrawal liability case. Well, you're going to have a withdrawal stage, yes, of this case. You're not there yet. And when we get to that stage, central states will not be entitled to a substantial deference in any determination that they make regarding withdrawal date. ERISA is clear that central states gets to make an initial determination of when the parties withdrew, but the employers can overcome that withdrawal under preponderance of the evidence. And that's what the Supreme Court said in the Concrete Pipe case, that plan, you make an initial decision. Employer, you can rebut that decision. Here, the preponderance of the evidence really is in dispute. A termination notice was sent that terminated the 2006 CBA on January 31st. A series of short-term agreements were entered into that incorporated the terms of the existing CBA. The last of those agreements expired at the end, as of November 15th, at midnight. Parties entered into a newer agreement that specifically says, we don't want our contributions going to central states anymore. They're going to go elsewhere. The union agreed on behalf of the participants, so it's not as though it's in the participants' interest to stay in central states either. Their bargaining rep agreed that we want it to go elsewhere. November 16th, no contribution obligation under any CBA, under any related agreement, and no obligation under labor law. So, I mean, there's really just simply no argument that the expectation for contributions to continue existed. Seventh Circuit has recognized exceptions, but only when there's actually a midterm termination. Thank you. Thank you. Mr. Madden. So, Mr. Madden, I'm going to guess that you don't think this is beyond argument. No, Your Honor. Albert Madden on behalf of central states and its trustees. Starting with Mr. Field's argument about the withdrawal liabilities statute and the contention that an employer's obligation can only stem from a union-employer agreement, that's not what ERISA says. Section 515 of ERISA makes an employer's contractual duty to contribute to the fund a statutory duty, and it provides that every employer who is obligated to make contributions to a multi-employer plan under the terms of the plan, or under the terms of a collectively bargaining agreement, shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement. So, here we have a plan provision that says that the employers cannot get out of the fund until they terminate their collective bargaining agreement. So, they say, though, fine, we terminated the collective bargaining, actually the collective bargaining agreement just terminated itself, and there were a lot of extensions, but the was quite clear that it was terminating the contribution obligation. The problem that they have, as the one you pointed out in the questioning, is that they did not terminate the collective bargaining agreement, and Ms. Hoffman referred to Article 3 of the trust agreement. The employer's duty can't end until after the termination of the collective bargaining agreement and the fund receives a notice. There's a two-step process here. They have to have the collective bargaining agreement terminated, then they provide notice to the fund. The problem that they have is that the collective bargaining agreement here was not terminated. It's the language that they used. It was extended. In your position, the use of that word extend was fatal to their position? It wasn't terminated until that later, that October 2012 date? Correct. Actually, it was terminated at the end of May 2012, but the trust agreement, like I said, has two conditions. You have to terminate your collective bargaining agreement, and you have to provide notice and your new contract to us. So the collective bargaining agreement was terminated on May 31, 2012, but they didn't get us the notice and the new contract until October 2012. That's why the contributions were run through that date. And at that point, you're out, right? Correct. So there will be some discussion about withdrawal liability, even if you should prevail here? Correct. Michaels is out of the fund as of October 2012. Okay. So there's argument, too, about what the standard of review should be here. Obviously, the Central States Fund has language in it that's designed to invoke the Bruck deference for giving the trustees the ability to exercise discretion of all sorts, but they say, well, but you don't have discretion over what the CBA means. You only have discretion over the plan. I think that the language of the trust agreement is certainly broad enough to cover that. The CBA would give the trustees authority over the meaning and termination of a collective bargaining agreement? Yes. Yes, it can. They can give. How can the trustees give themselves authority to interpret an agreement to which they are not a party? They agreed to that. No, no. The trustees may agree to that, but... But they agreed to be bound by the trust agreement, and it's not uncommon in a benefits case. You're making the case, I just want to understand what your position is, that if the parties to the CBA say it's okay with us to delegate this authority to the trustees, the parties to the agreement could do that. I'm not sure they did that here, but it's... Our position is that by agreeing to be bound by the trust agreement, they agreed to give the trustees this discretionary authority to interpret the collective bargaining agreement, and it's not uncommon in a benefits case. The question of eligibility turns on what does the collective bargaining agreement provide, and the trustees are making those decisions on a regular basis. And here the language is clearly broad enough to encompass that, and it's all questions or controversies of whatsoever character arising in any manner between any parties or persons in connection with the fund or the operation thereof, and then it says it includes the authority to resolve disputes as to the construction of the language or meaning of any writing, decision, instrument, or accounts in connection with the operation of the trust fund. So you're saying that by agreeing to participate in that, they said if you need to interpret the CBA, you can do it. Yes, yes, yes. And there are arguments in Michael's brief where they contend that that language is vague, and they point to Article 2 and Article 4 of the trust agreement, and they say that those contradict that. None of those arguments were made in their presentation to the trustees or in their district court briefs. Another argument that they raised for the very first time on appeal is the contention that the fact that the issue went back to the trustees for the second time indicates that there's some type of a conflict just because the trustees looked at the issue twice. But the essence of this case, though, is what is the effect of that November 15 instrument? Because if it was enough by itself to terminate the relevant parts of the collective bargaining agreement, then this extra $1.2 million or so doesn't get paid this way. I mean, maybe it changes what the withdrawal liability looks like. I don't know what the downstream effect of it is, but at least the $1.2 million or so is not due. And so we need to focus, I think, on that November 15 instrument. And that instrument, again, like the other one, says that it is extending the national pipeline agreement. And so that agreement continues in effect, and meanwhile, part of that agreement is to be bound by the trust agreement, and they're bound by the trust agreement by their participation in the fund. And the trust agreement says that... So from CBA to trust to participation to... CBA to trust agreement, I think. That 11-15-11 agreement extends the pipeline agreement. It purports to eliminate the duty to contribute to the fund, but the preexisting provision, the entire term provision of the trust agreement, foreclosed the possibility of eliminating the duty to contribute to the fund before the actual termination of the collective bargaining agreement. So are you saying, maybe to phrase it differently, that the fund would also have had to agree for the November 15 agreement to function the way they would like? Yes. Yes. As a party to the trust agreement. Because they had committed to us that until the collective bargaining agreement had terminated, they were going to pay contributions to the fund. Mr. Madden, can I ask you, again, focusing on the November 15, 2011 agreement, one of the whereas clauses speaks of whereas agreement on certain other issues have not been reached. What does that refer to? They hadn't reached agreements on anything that's not in this document, this 11-15 document. They hadn't reached agreement on it. So things like wages... Were those issues that were contained in the CBA that you say was extended? Yes. Yes. They had wage rates, they had fringe rates. If you are now taking, if the parties are not in agreement on the agreement that you say extends, how can it be the same agreement? In other words, isn't the signatories to the November 15, 2011 are suggesting that this is an interim agreement, right? I think they're saying, Judge, that they haven't reached agreement on changes. I don't think there's any misunderstanding between either you or me or the parties, but I'm saying when you have a clause that suggests that what is to be signed is a different document, though it may reference a document that's been had as to other terms, does that alter what is being signed? In other words, is it the classic extension? In other words, you're getting rent for the same space at the same rate, but now not. Maybe it's different space, different rent. I just... So that's the big question. Were they saying until something new, we're sticking with the old rent, so to speak? We're sticking with the old wages under the 2006 and what we haven't agreed on is going forward? Or are they saying we're just in a free-for-all at the moment where anybody will do whatever they want? I think what they're saying is we are extending everything in place... We're still operating under every word of the 2006, except this one that we've tried to carve out, of course. So that's the... I mean, I think it's a really important point to clarify what this we haven't agreed yet language means. They haven't agreed to changes... To the future. To the changes that are gonna be made to that 2006 agreement. And until we agree, we'll operate under the past. And that's why they extended it. Counsel, would you have any problem if they had simply submitted a freshly typed copy of the 2006 agreement with the terminal date changed and the contribution language omitted, signed it, and then sent it to the fund? Any doubt that that ends the obligation to make ongoing payments? Assuming it was properly done, that it was signed by... If it's signed by the authorized representatives of the party. It has to be ratified by the IBT, which they couldn't do at that point because they didn't have agreements on everything else. Answer my question and then we can go to variations. Yes or no? I would agree with that, if it had been signed and ratified appropriately. So if they type everything out and it's ratified, no problem. My question for you, and this seems to be the core of your position, is that it matters whether you type everything out or instead incorporate things by reference. And the question is why, as a matter of law, should it matter that a contract is self-contained as opposed to incorporating things by reference? Well, I think because in ERISA, things are literally interpreted. And this literally... Incorporations by reference are literally interpreted. If a contract says, we incorporate and here the Declaration of the Rights of Man of 16, 17, whatever, there's no need to type it out. It's there. If you look at every complaint filed in a federal suit, count three is going to begin. We hereby incorporate paragraphs 1 through 15 as fully as if set forth fully herein. It's redundant legalese, but lawyers incorporate things all the time. Why is that forbidden when it's an ERISA document or a document that affects ERISA? Because the document here said that until it's actually terminated, the duty to contribute continues. So you have to be saying that they didn't do what Judge Easterbrook says. Maybe there are reasons why they did... What you're getting at is that there are reasons why sticking with the formality of using the word extension or retyping it matters. Would they really want to sign a two-month agreement if it's that short? Would you really go through all of the things? So you have to say that the formalities of what it says it's doing matter, not that you can't... I mean, surely you can incorporate by reference. I mean, you can do all of these things. They didn't. Your opponents say that it's meaningless and that you're seizing on just a pointless formality. You, I understood to be saying that there is actually something at stake in insisting on the difference between a real termination and an extension. Yes, yes, and it's because the documents are what they are. We have to make our benefits decisions for the employees based upon the documents. And the documents... And you don't want to look behind the word extension and try to figure out whether in this case the extension is really a termination. You want to be able to take it literally. That's correct. We don't want to have a participant suing us in a couple of years saying, I should have credit through May of 2000 or October of 2012. And that's a potential that's out there. That's why these documents have to be literally construed, and that's why it's important. What they did here was they extended the agreement. They didn't terminate it. They didn't do a new contract. They amended it, right? They extended it. Well, I think it says the word amend. Yes, and amended it, but that amendment is foreclosed by the preexisting commitment to the fund that they would continue to contribute until that contract was terminated. They extended it. Okay, thank you very much. Thank you. I think you're just about out of time. Anything further, Ms. Hoffman? First of all, I think there's a difference between an evergreen clause that this court has addressed in cases like Standard Electric where termination notice was not properly given, so the contract automatically extends for a year, and the kind of extensions that were entered into here where proper termination notice was given, there's no dispute over that. Every time the parties enter into one of these agreements to extend, it's a new agreement under federal labor law. The old contract terminates. The new extension begins, and that's exactly what happened at midnight of November 11, 2011. The old extension terminated. The new extension and amendment began, and there's no question that the terms and conditions of employment from November 15, 2011, to December 31, 2011, included new job classifications, new contribution obligations, none of them to central states, and everything else that was contained in the old collective bargaining agreement incorporated by reference. Central states can't point to any case in the history of the multi-employer plan provisions of ERISA rejecting the terms of an extension that changed an obligation to contribute where there had been proper notice given of termination, and the reason is because the position central states is taking in this case is, in fact, unreasonable. No participant's going to sue because the terms of the November 15 agreement are clear, and those contributions went to another pension fund that are giving them benefits in a well-funded plan, not central states. OK, you need to wrap up, I think. Thank you. All right, thank you very much. I believe that, Mr. Field, you've used up your time, so we appreciate everybody's arguments. We'll take the case under advisement.